Filed May 23, 1893.

———————◆———————

No. 599.

## LEVEY ET AL. *v.* BIGELOW, BY NEXT FRIEND.

CONTRIBUTORY NEGLIGENCE.—*A Question of Law.—Obvious Danger.—Youthful Employe.—Apprentice.—Printing Press.—*A boy seventeen years of age, possessing the ordinary discretion of such age, was employed as an apprentice in a printing establishment, learning the trade of pressman. He had been thus employed for more than two years, had from time to time been instructed as to the manner of doing his work, and of operating the press, which was a "Babcock Printer," and had often seen others remove the rollers and do other work necessary in cleaning and repairing it, and had often assisted in this work. On the day that said employe received the injury for which he brought suit, he was directed by the foreman to remove a large ink roller from the press for the purpose of repairing it, which he had done many times, and with the methods of removing the roller, and the attending danger, he was familiar. To remove the roller, he shifted the belt which ran the press on to the loose pulley, which was in close proximity to the tight pulley. This he had often done, which was accomplished by means of a lever. He was acquainted with the fact that the belt when working on the loose pulley could be easily transferred

to the tight pulley which gave motion to the press, and that with the machinery in such condition, it was highly dangerous to get inside of the movable framework of the press, unless the shifting lever was secured in its position in some manner, as he had often seen done, and done himself, by means of a cord or prop. After shifting the belt and stopping the press, but without securing the shifting lever, and without asking for aid, which was obtainable, and by means of which he could have removed the roller without getting inside of the movable parts of the press, he stepped inside of the table containing the forms, and in removing the roller from its place, it came in contact with the shifting lever, and the belt was thereby thrown onto the tight pulley, and the press set in motion, whereby said employe was so injured that one of his legs had to be amputated.

*Held,* that the danger to which plaintiff exposed himself was obvious, and that in so exposing himself he was guilty of contributory negligence.

*Held,* also, that plaintiff's judgment was mature enough to comprehend and appreciate the danger to which he exposed himself.

SAME.—*A Question of Law.—When?*—The questions of care and want of care depend upon the circumstances of the case, and when, from these circumstances, only one inference can be legitimately drawn, and that a want of proper care, then negligence may be ruled as a matter of law.

NEGLIGENCE.—*Province of Jury and Court in Determining.*—The jury can not, arbitrarily, infer negligence from any state of facts, but it is the duty of the court to instruct the jury what facts within the issues, if established by the evidence, may, or may not, under the circumstances, constitute negligence, or contributory negligence, leaving to the jury the duty of determining whether the facts have been proved or not, and the inferences to be drawn therefrom.

APPEAL—*Appellate Court Practice.—Verdicts, when not Disturbed on Appeal.*—Verdicts will not be disturbed in the appellate tribunal, except in very clear cases.

EMPLOYER AND EMPLOYE.—*Respective Duties and Rights.*—It is the duty of the employer to furnish his employe with reasonably safe machinery, tools, and appliances, and place to work, and exercise reasonable supervision and care to keep them safe; and the employe has the right to repose confidence in the prudence and caution of the employer, and rest on the presumption that he has done, and will do, his whole duty in supplying such appliances, and in keeping them reasonably safe, and to rest on the presumption that the place and appliances are free from latent perils.

SAME.—*Youthful Employe.— When on All Fours with Adult.*—In respect to all matters wherein a young and inexperienced employe is competent to understand and avoid the dangers, such employe stands upon the same footing with an experienced adult.

Levey *et al. v.* Bigelow, by Next Friend.

NEW TRIAL.—*Motion for Must be Brought to Court's Attention.—Sufficiency of Record as to Motion for.*—It is not sufficient to present a motion for a new trial to the clerk, and request the same to be placed among the files of his office, but the motion must be brought to the attention and knowledge of the court, and where the record purporting to give the proceedings of the case shows that "afterwards, to wit, on the 26th day of February, 1891, being the forty-sixth judicial day of the January term, 1891, of said court [the trial having occurred at said term], * * * the following proceedings were had herein, that is to say : Come now the defendants, by their attorneys, and file their motion and written reasons for a new trial in this cause, in the words and figures following, viz.," following which is the action of the court, it is sufficiently shown that the motion was presented to the court at the term when the trial was had.
*Quære,* what constitutes a court?

From the Marion Circuit Court.

*F. Winter* and *J. B. Elam,* for appellants.

*P. W. Bartholomew* and *C. E. Averill,* for appellee.

LOTZ, J.—The appellee sued the appellants to recover damages for personal injuries sustained by him through and by the alleged negligent acts and conduct on the part of appellants. The complaint, after stating the business in which appellants were engaged, and describing the location where it was carried on, then further alleges that appellants operated in their establishment a very large and powerful printing press called the "Babcock Printer." A full description of this machine is given, and it is averred that the removal of a certain heavy iron roller from its place in the press was a work of great hazard, while the belt communicating power to the press was revolving on the loose pulley at the side of the machine; that at the time the appellee received his injury he was a boy about seventeen years of age of immature judgment and experience, and ignorant of, and uninstructed in respect to, the hazard and peril stated; that he was learning the trade of "pressman" in said establishment, by and with the consent and approval of appellants, and under the direction and control of their foreman; that appellee was ordered by the

foreman to remove the iron roller aforesaid, so that the same might be repaired; that it was necessary in order to remove the roller to get within the frame of the press; that while he was obeying and carrying out the order of the foreman, and while he was in the exercise of due care, and without any fault or negligence on his part, he received the injuries which resulted in the loss of his leg; that at the time he received such injuries, he was ignorant of the hazard and danger incident to said work, and had never been warned nor instructed in relation thereto; that on account of appellee's youth, inexperience, and immaturity of judgment, he did not, and could not, know how to perform, nor had he been instructed by appellants, nor any one for them, as to the manner of performing such work, so as to avoid the danger; that he had no assistance, and that no one was ordered or directed to assist him; that the belt was not thrown off the pulley, nor was he authorized to throw it off.   It is also alleged that the throwing of the belt from the pulley was exclusively under the control and direction of the foreman; and it is further averred, that the appellants, by the exercise of proper care, might have known and did know, that the appellee was of immature judgment and experience, and ignorant of, and uninstructed in respect to, the dangers of the work; that appellant had full knowledge of all the hazards and dangers of the work, but that notwithstanding their full knowledge in the premises, they carelessly and negligently ordered him to perform the work without providing any assistance, and without warning him or instructing him in any respect, and without taking any means to care for his safety. These are the substantial allegations showing the manner of the infliction of the injuries, and the negligence of the appellants.

There was a trial by jury, and a verdict for appellee in the sum of one thousand dollars.   The jury also returned answers to certain interrogatories submitted by the appel-

lants. A motion for a new trial was filed and overruled, and final judgment followed. The ruling on the motion for a new trial is the only error assigned.

The appellee asserts that the motion for a new trial was never properly presented to the trial court, and for that reason this court should not consider it. The basis for this claim is that the record does not affirmatively show its presentation to the trial court, and that this court will not assume anything not affirmatively shown by the record in order to overthrow the judgment. *Cline* v. *Lindsey*, 110 Ind. 337; *Graves* v. *Duckwall*, 103 Ind. 560. And, further, that the appellee is entitled to everything in the record which may prevent a reversal upon the errors assigned. *Martin* v. *Martin*, 74 Ind. 207. It is true that a motion for a new trial must be presented to the court. Filing it with the clerk alone is not sufficient. *Emison, Trustee,* v. *Shepard, Admr.,* 121 Ind. 184; *Gilbert* v. *Hall*, 115 Ind. 549.

The record in this case, however, shows that the cause was tried "before the Honorable Edgar A. Brown, sole Judge of the said Marion Circuit Court."

It also further appears that on the 18th day of February, 1891, being the thirty-ninth juridical day of the January term, 1891, the jury returned its verdict into open court. "And afterwards, to wit, on the 26th day of February, 1891, being the forty-sixth juridical day of the January term, 1891, of said court, before the same honorable judge, the following proceedings were had herein, that is to say: Come now the defendants, by their attorneys, and file their motion and written reasons for a new trial, in this cause, in the words and figures following, viz." Then follows, in the record, the action of the court. At the next succeeding March term of the court, this motion was overruled. It is not sufficient to present the motion and written causes to the clerk, and request that the same be placed among the files of his office, but the motion must be brought to the attention and knowledge of the

court.  The record does not say, in direct terms, that the motion was brought to the notice and knowledge of the court, but it does purport to give the proceedings had in a certain cause in the Marion Circuit Court, and while the Hon. Edgar A. Brown was presiding as judge thereof. This indicates that the court was in actual session at the time.  A court has been defined as "a place where justice is judically administered."  Coke on Litt. 58; 3 Bl. Comm. 23.  This definition, however, has been often criticised as too narrow, being limited by the word place.  The prominence of the word place, in this definition, no doubt, arises from the ancient idea that the king was the fountain and dispenser of justice, and wherever he was domiciled was a court or place where justice was dispensed.  In modern times, and under our form of government, the judicial power is exercised by means of courts.  A court is an instrumentality of government.  It is a creation of the law, and, in some respects, it is an imaginary thing that exists only in legal contemplation, very similar to a corporation. A time when, a place where, and the persons by whom judicial functions are to be exercised, are essential to complete the idea of a court.  It is in its organized aspect, with all these constituent elements of time, place, and officers, that completes the idea of a court in the general legal acceptation of the term.  But a court may exist in legal contemplation, without any officers charged with the duty of administering justice.  The officers might all die or resign, and still the legal fiction would continue to exist. The judge of a court, while presiding over the court, is, by common courtesy, called "the court," and the words "the court," and "the judge," or "judges," are frequently used in our statutes as synonymous.  *Michigan Cent. R. R. Co.* v. *Northern Ind. R. R. Co.,* 3 Ind. 239 (245).  The record from which we have quoted shows that the sole judge of the court was presiding over the court at the time the motion was filed.  We have here all the elements of time,

place, officer, and actual exercise of judicial power. It is sufficiently shown that the motion was presented to the court at the term when the trial was had. The facts, as proved on the trial, are substantially as follows:

William H. Levey and Louis H. Leyey were partners, carrying on the business of printing, in Indianapolis, Indiana. In May, 1890, the firm had four printing presses, one of which was called a Babcock press, two were called Potter presses, and one a Cincinnati stop press. The Cincinnati press was a small one, and the Potter presses were smaller than the Babcock press. The presses were operated by steam power. There were ten persons, including apprentices, employed in the establishment. The work was in charge of a foreman. On the 22d day of January, 1888, the appellee Isaac Bigelow became an apprentice in this printing establishment. He desired to learn the trade of a pressman. At the time of beginning work for the appellants, the appellee was sixteen years and four months old. Before commencing to work in such establishment, appellee had no knowledge of the printing business or the press. He was placed under the control of the appellants' foreman. He was bright, intelligent, and active, and possessed at least usual physical strength for one of his age. He was injured while working about the Babcock press, on the morning of the 27th of May, 1890. He worked continuously for appellants from the 22d day of January, 1888, to the time of his injury, being a period of two years and four months. He was employed in various ways, and at different parts of the work carried on by appellants. Before the injury, appellee had assisted in taking the Babcock press apart, and in setting it up again in a new location. This Babcock printing press was a machine upon which an employe might be injured, but it was not an especially dangerous machine, nor were its operations and construction difficult to comprehend. The appellee was familiar with its construction and the method of op-

erating it. The Babcock printer was set in an iron frame, was about seven feet high at one end, and lower at the other, about twelve feet long, two feet wide at the front, and wider in other portions. There was an ink well or fountain at the top large enough to hold a considerable quantity of ink. When the machine was operated the ink was slowly discharged from this fountain upon a system of rollers placed below it in the iron frame, by which rollers the ink was distributed until a space at least as wide as the matter to be printed was saturated with ink. Under these rollers, which were made of different materials, and differed somewhat in size and weight, there was passed back and forth what was called the bed of the press. This bed carried the form from which the printing was done, and the paper upon which the impression was to be made was fed to the machine by an employe. The bed was securely placed in the press, and was very heavy. When the press was in operation, the play or movement of the bed was from one end of the press to the other, or nearly so. The bed was about five feet wide, and had a play or movement back and forth of about four feet. The movement of the bed was not rapid, as time was allowed for the ink from the rollers to make a distinct impression upon the paper. At one end of the frame there were two cylinders, and upon the end of the movable bed, which, when in operation, approached that end of the frame, there were two plungers which fitted closely into the cylinders, and thus constituted an air chamber, which served to gradually check and stop the movement of the bed. There was a short counter-shaft above the press, about ten feet from the floor, from which the power was communicated to the machine, or press, by means of a belt. This belt passed from a pulley upon the shaft to a pulley on the south side of the press. Within about an eighth of an inch of the fixed pulley upon which this belt ran when the machine was in operation, there was upon the same shaft a loose

pulley, to which the belt was shifted when the machine, was to be stopped. The same result could be accomplished by throwing the belt from the pulley on the counter-shaft above the machine, and, if the press was to be stopped for a considerable time, the latter course was sometimes adopted, although it was not usual to stop it in this way. When the belt was shifted from the tight to the loose pulley, or vice versa, it was done by means of a shifter, which was on the opposite or north side of the machine. This shifter consisted of an upright lever, standing outside of the frame of the press, working loosely on a bolt, which bolt was placed about eighteen inches from the lower end of it. The lower end of the shifter connected with a rod which passed across the lower part of the press, and was adjusted with respect to the belt which was to be shifted from the fixed to the movable pulley, in such a way that when the top of the shifter was moved towards the frame a distance of about eight or ten inches, the belt would be forced upon the fixed pulley, and the machine would start, and when the top of the shifter was pushed outward from the frame the belt would be transferred to the loose pulley, and the press would stop. If a small portion of the width of the belt was moved upon the tight pulley, the resistance readily forced the whole width upon the pulley and started the press. The upper part of the shifter was shaped so as to be convenient to grasp with the hand, and, in the operation of the machine, the belt was moved from the fixed pulley to the loose one, and back again from the loose pulley to the fixed one. The method of throwing the lever, which constituted the shifter, back and forth, and thus starting and stopping the press was simple and easily comprehended by any one of ordinary intelligence, who operated the machine for a short time, or saw others operating it. The appellee was acquainted with the action and purpose of the shifter, and the method of using it. He testified that, among other work done at appel-

lants' place of business, he fed and assisted in the operation
of the machine by which he was injured, and had used
the shifter in starting and stopping the press. One of the
first things learned by an apprentice in that establishment
was to feed the press. He had advanced beyond that
stage of apprenticeship, and at the time of his injury was
assisting on the floor, as it was called, which meant, among
other things, that he assisted in making up and putting in
the forms from which the printing was done. When feed-
ing, it was necessary to stop and start the press about
every twenty minutes. During the several months' ser-
vice in said establishment, appellee operated the shifter,
starting and stopping the machine by means of it a large
number of times. And he had often assisted in cleaning
and preparing the press, and had been present when others
were doing it, and had often, on such occasions, seen the
shifter tied with a rope or propped with a stick, so that it
could not be accidentally or readily removed, and on other
occasions had seen the belt that ran the press thrown
from the pulley on the counter-shaft above, by means of a
long stick kept in the place for the purpose of shifting
belts from pulleys on the shafts overhead. Some such
precaution was taken to prevent the accidental starting of
the press whenever it was necessary to get inside of the
frame or under the bed upon which the form was carried,
or elsewhere when there was danger of being caught by
the heavy bed, if set in motion. There were at least three
ways of preventing such an accidental starting of the
press, with all of which the appellee was familiar, and
each of which he had often seen employed, and in some
instances had himself assisted in so securing the press, by
tying the shifter, by propping it with a stick between the
frame-work, and by throwing the belt from the pulley on
the counter-shaft. He sometimes shifted the belts with
the iron rod, which was an easy thing to do, and he knew
perfectly well how to do it.

Among the rollers mentioned there was one of iron, about five feet long, and two and a half inches in diameter, weighing from fifty to sixty pounds, and when in place extending horizontally from the north to the south side of the press. It was necessary to remove this roller frequently, at least as often as once a day, for the purpose of cleaning it, and this was a part of the work performed by apprentices, and had often been done by appellee. This roller might be removed from its place if two persons were doing it, by one standing at each end, entirely outside of the frame, and lifting it from its place. If one person was removing it, he could stand outside the frame, and if he possessed sufficient strength, lift one end of the roller with one hand, and extend the other toward the center of the roller, and grasping it there lift it and draw it toward him. One objection to taking it out in this way was that in grasping the roller toward the middle the hand became covered with ink, as that part of the roller was always wet with ink. Appellee had removed the roller for the purpose of cleaning it, without assistance, at least a dozen times. It was somewhat easier to lift from its place by grasping it with both hands near the center, and appellee had removed it on former occasions by grasping it in this manner. On the day of the injury appellee had stepped inside of the frame of the machine, and within the space where the bed carrying the form moved back and forth. He had removed the roller in this way a number of times before, without accident. There was on the north end of this iron roller a small projection called a spindle, about six inches long, and extended around it in the form of a collar or ring, which stood at right angles to the axis of the roller, and projected beyond the outer surface of the roller an inch or more. Near the end of this spindle was a spool, cam, or cog, as it is variously called by the witnesses, which served to give the roller a vibratory motion, which motion was necessary in the proper distribution of the ink. This

spool, or cam, was a round piece of iron, one and one·half inches in diameter, and one and one-half inches in length, firmly attached to the spindle of the roller, the spindle passing through it. In lifting the roller from its place by grasping it with both hands in the middle part, it was convenient, in order to get it out of its bed and clear of the frame of the machine, first to pass the north end outside of the frame and in close proximity of the vertical shifter, and then carry it somewhat to the south again. After the south end had passed certain obstructions presented by the framework and other parts of the press, it could be lifted out. Appellee was familiar with the roller and the projecting spool at the north end, and with the position and movement of the shifter, which stood outside of the frame of the machine.

On the morning of the day when the injury was inflicted, appellee was preparing to begin the operation of the press, when he discovered that there was a broken cog in the machinery which operated the roller, and informed the foreman of the fact. The foreman directed him to remove the roller from the press and take it to a machine shop and have it repaired. There was at the time another apprentice and journeymen about the place in the building, and the apprentice had just been assisting appellee in some work he was doing about the press, but had gone to some other part of the room. At this time the belt was running on the loose pulley. Without asking any assistance, appellee undertook to remove the roller, and without securing the shifter in any manner, or throwing the belt from the pulley at the counter-shaft above, he stepped inside the frame of the press, lifted the roller from its bed, passed it to the north until the end carrying the projecting spool extended beyond the shifter, and then drew it toward the south, when the spool or spindle caught upon the shifter, and pulled the shifter toward the press. This shifted the belt from the loose pulley to the

fixed one, and started the press. Before appellee was aware that the shifter had been moved, or had time to escape, his leg was caught between one of the cylinders constituting the air chamber, and its plunger or some part of the frame of the moving bed, inflicting an injury which afterwards required the amputation of the limb. Appellee could not see the position and movement of the north end of the roller, as it was projected near the shifter, and drawn back again, for the reason that the ink fountain above the rollers obstructed his vision, and he did not feel the spool, spindle, or projection catch the shifter as he drew the roller back, but he testified that he knew of no other way in which the press could have been started. He also testified that he knew that if the machine started while he was in the frame there was great danger of being caught. The appellee had from time to time received instructions as to the manner of doing his work, and of operating the press, and had often seen others remove the rollers, and do other work necessary in cleaning and repairing it, and he had often assisted in this work. But no one had ever warned him of the danger, or instructed him how to take the rollers out alone. Appellee was receiving five dollars per week for his services.

In making this summary, we have given the appellee the advantage of every conflict in the evidence, and resolved every doubt in his favor. At the request of appellants, the court submitted certain interrogatories to the jury to be answered with their general verdict. The interrogatories and answers are as follows:

"*First.* Did not the plaintiff know, before he received the injury of which he complained, that it was unsafe to stand inside the frame of the printing press while engaged in removing the roller, unless the belt was removed from the pulleys at the counter-shaft, or the shifter was fastened

so that it could not be moved by coming in contact with the roller?

"Answer. 'No.'

"*Second.* Did not the plaintiff know, before he received the injury of which he complains, that the roller could be removed by one person without danger, if the belt was removed from the pulleys at the counter-shaft, or the shifter was tied or otherwise fastened, so that it could not be moved?

"Answer. 'No.'

"*Third.* Had not the plaintiff himself, at various times, before he received the injury of which he complains, while working about the printing press in question, removed the belt from the pulleys at the counter-shaft, and tied back the shifter, and fastened it back with a stick, so as to prevent it being moved while he was engaged in his work?

"Answer. 'No.'

"*Fourth.* If you answer the last interrogatory in the affirmative, did not the plaintiff, in so acting, do so because he knew there was danger of the press being started by the shifter being moved, while he was engaged in his work?

"Answer. 'No.'

"*Fifth.* Did not the plaintiff know, or could he not have known if he had reflected or looked before receiving the injury of which he complains, that there was danger of the end of the roller coming in contact with the shifter and starting the press, if he should attempt to remove the roller by standing inside the frame, and pushing the end of the roller through the frame towards the shifter, and then withdrawing it towards himself?

"Answer. 'No.'

"*Sixth.* Did not the plaintiff know, or, if he had reflected, would he not have known, that it was unsafe to remove the roller without assistance, while standing inside the frame, and in such a position that he could not see the

end of the roller next to the shifter, or the shifter itself, by pushing the roller through the frame towards the shifter, and then withdrawing it towards himself?

"Answer. 'No.'

"*Seventh.* What, if anything, was there that prevented the plaintiff from having assistance in removing the roller?

"Answer. 'Nothing.'

"*Eighth.* What, if anything, was there that prevented the plaintiff from tying back the shifter or fastening it back with a stick, or from removing the belt from the pulleys at the counter-shaft, before he attempted to remove the roller?

"Answer. 'None.'

"*Ninth.* Had not the plaintiff, before he received the injury in question, worked for defendants for over two years and four months, and became familiar with the printing press in question, and the danger of working inside or under it, unless the belt was removed from the pulleys at the counter-shaft, or the shifter was tied or otherwise fastened back?

"Answer. 'No.'"

The appellee contends that this court may look to the interrogatories and answers to assist it in determining whether or not the verdict is supported by sufficient evidence. The main purpose of interrogatories, and the answers thereto, is to test the correctness of the general verdict. It is also true that the special findings may sometimes be looked to for other purposes. *Cleveland, etc., R. R. Co.* v. *Newell,* 104 Ind. 264. The general verdict covers all the issues in the case; and if the special findings harmonize with the general verdict, they may be taken as corroborative, for they then indicate that the jurors have considered special facts in arriving at their verdict. But the general verdict yields to the special findings only when there is such a conflict between them that they can not be reconciled upon any reasonable hypothesis. *Evansville,*

*etc., R. R. Co.* v. *Marohn, ante,* page 646. The answers. to the interrogatories, as above set out, in the main corroborate the general verdict, but they do not entirely harmonize with it, for the answers to numbers seven and eight have a tendency to show contributory negligence on the part of the appellee. Several of the answers seem to us to be in direct conflict with admitted facts. In this condition of the special findings, we are able to derive but little if any assistance from them in determining whether or not the verdict is supported by the evidence. In determining this question, we believe the correct rule is to look to the evidence alone, and be uninfluenced by the special findings.

Whether or not this court has the right to disturb the judgment of the lower court, for want of evidence to support the verdict, depends upon several contingencies. Where there is a conflict in the evidence, this court will not weigh it, but must accept the verdict and judgment of the lower court as conclusive. However, when all the material facts are conceded, or are undisputed, and only one inference can be legitimately drawn from them, this court has the same right to draw the inference as has the jury or the trial court. The issue here is negligence, and negligence is usually a mixed question of law and fact. An act under certain circumstances may constitute negligence, and the same act, under other circumstances, may not constitute negligence at all. Care and want of care depend upon the circumstances. If only one inference can be legitimately drawn from the circumstances, and that inference indicates a want of proper care, then negligence may be ruled as a matter of law. If the inference indicate proper care, then no negligence may be ruled as a matter of law. Under such circumstances it is the duty of the court, either to direct a verdict, or wrest the case from the jury, and pronounce judgment upon the facts. If, however, both inferences may be reasonably drawn

from the circumstances, it is a question for the jury to determine which one shall prevail under proper instructions from the court. These same rules govern the question of contributory negligence. The jury can not, arbitrarily, infer negligence from any state of facts. It is the duty of the court to instruct the jury what facts within the issues, if established by the evidence, may, or may not, under the circumstances, constitute negligence or contributory negligence, leaving to the jury the duty of determining whether the facts have been proved or not, and the inferences to be drawn therefrom. *Ohio, etc., R. W. Co.* v. *Collarn*, 73 Ind. 261; *Louisville, etc., R. R. Co.* v. *Eves*, 1 Ind. App. 224; *Evans* v. *Adams, etc., Co.*, 122 Ind. 362; *Shoner* v. *Pennsylvania Co.*, 130 Ind. 170; *City of Franklin* v. *Harter*, 127 Ind. 446; *Wabash, etc., R. W. Co.* v. *Locke, Admr.*, 112 Ind. 404; *Gregory, Admr.*, v. *Cleveland, etc., R. W. Co.*, 112 Ind. 385; *Mann* v. *Belt R. R. and Stock Yard Co.*, 128 Ind. 138; *Rush* v. *Coal Bluff, etc., Co.*, 131 Ind. 135; *Railroad Co.* v. *Stout*, 17 Wall. 657; Elliott's Work of the Advocate, pp. 690–691, and authorities cited; *Brown* v. *Wood*, 16 Atl. Rep. 42.

If, from the conceded or undisputed facts of this case, negligence, and the absence of contributory negligence, may be reasonably and fairly inferred, then this court has no right to invade the province of the jury and weigh the evidence. The verdict will not be disturbed except in very clear cases. *Kentucky, etc., Bridge Co.* v. *Quinkert*, 2 Ind. App. 244; *Eichel* v. *Senhenn*, 2 Ind. App. 208.

The same is true with reference to the nonexistence of contributory negligence. In actions of tort, whether or not a certain act constitutes negligence, depends upon the duties imposed by law. This leads to the inquiry as to the respective rights and duties of the appellants and appellee. It is the duty of the employer to furnish his employe with reasonably safe machinery, tools, appliances, and place to work, and exercise reasonable supervision and care

to keep them safe. The employe has the right to repose confidence in the prudence and caution of the employer, and rest on the presumption that he has done, and will do, his whole duty in supplying such appliances, and in keeping them reasonably safe. He may also rest upon the presumption that the place where, and the appliances with which, he works are safe from any hidden or undisclosed perils which are not open and obvious to his senses. But the employer is not an insurer of the employe against injury, nor is he required to supply appliances that are safe beyond question. *Cincinnati, etc., R. W. Co.* v. *Roesch,* 126 Ind. 445; *Pennsylvania Co.* v. *Burgett,* 33 N. E. Rep. 914; *Pennsylvania Co.* v. *Brush, Admx.,* 130 Ind. 347; *Indiana Car Co.* v. *Parker,* 100 Ind. 181; *Louisville, etc., R. W. Co.* v. *Buck,* 116 Ind. 566; *Bradbury* v. *Goodwin,* 108 Ind. 286.

There are also certain duties resting upon the employe. He is not required to search for hidden or undisclosed perils, but he must take notice of such as are open and obvious to his senses; and he is bound to use the machinery and appliances with prudence, and exercise that degree of care commensurate with the known dangers involved. *Griffin* v. *Ohio, etc., R. W. Co.,* 124 Ind. 326; *Vincennes, etc., Co.* v. *White,* 124 Ind. 376; *Jenney, etc., Co.* v. *Murphy,* 115 Ind. 566; *Lake Shore, etc., R. W. Co.* v. *McCormick,* 74 Ind. 440; *Umback* v. *Lake Shore, etc., R. W. Co.,* 83 Ind. 191.

These rules apply in all cases where the master and servant are upon an equal footing.

The charge made by the complaint is not that the machine itself was dangerous, or the removal of the iron roller a specially hazardous undertaking, but the peril averred is in attempting to remove the roller by getting within the frame while the belt was revolving on the loose pulley, in close proximity to the tight pulley, that communicated power to and set the machinery in motion. This peril, it is charged, the appellee was incapable of un-

derstanding and appreciating, owing to his youth, immature judgment, and want of experience, and that appellants failed to give him proper instruction, or furnish him with assistance. Appellee's own admissions dispel several of these averments. It is apparent, from his admissions, that he was possessed of sufficient capacity and understanding to know how easily the belt could be shifted from the loose to the tight pulley. This he had done a great number of times. He also knew that it was dangerous to be within the frame when the machine was in motion. He knew how to secure the shifter by tying it with a string, or by propping it with a stick, so that the belt could not be easily transferred to the tight pulley. Both of these he had done many, times. He also knew that the roller could be removed without getting within the frame, by two persons standing on the outside, for this he had assisted in doing. He might have had help had he desired it, and thereby need not have exposed himself to the action of the sliding bed. We think the danger involved in attempting to remove the roller, by getting within the frame while the belt was revolving on the loose pulley, without securing the shifter, was an open and obvious danger, and that appellee had sufficient judgment and experience to know and appreciate it without instructions.

In *Pennsylvania Co.* v. *O'Shaughnessy,* 122 Ind. 588, it was held, that an employe who does what he is ordered to do by the master or those placed over him, is protected to a reasonable extent by the order while engaged in performing the special duty enjoined upon him, but that it is incumbent upon him, whether acting under the orders or not, while engaged in the line of his duty, to use ordinary care to avoid injury; that where there are two ways open to him to do a certain thing, one of which is entirely safe and the other perilous, and he voluntarily adopts the dangerous method, knowing the danger to which he exposes himself, and using no precaution to avert it, he is guilty

of contributory negligence, and can not recover. Here there were three ways by which appellee might have done the thing ordered in comparative safety, by securing the shifter, by throwing the belt off the pulley on the counter shaft, and by calling assistance. If he recklessly or heedlessly exposed himself to the danger, then his own negligence contributed to the injury, and he can not recover.

We accord to the appellee the full force of the rule that where negligence is a matter of inference for the jury to draw, that this court has no right to interfere with the verdict, but the conceded facts of this case fail to show that he did not understand and appreciate the perils involved. If he appreciated the danger, he must have had sufficient judgment to avoid it by the exercise of due care. Upon both principle and authority, it is clear that in respect to all matters wherein a young and inexperienced employe is competent to understand and avoid the dangers, such employe stands upon the same footing with an experienced adult.

Counsel for appellants, in their able and exhaustive brief, have cited many authorities bearing upon this question. We call attention to a few that seem most pertinent.

In *Costello* v. *Judson* (N. Y.), 21 Hun, 396, a boy fourteen years of age was employed to carry water in the building where a number of persons were employed. While ascending in the elevator he projected his foot beyond the elevator floor so that it was caught upon the arch of one of the doors opening into the elevator, and so injured that amputation was necessary. The court affirmed a judgment for the defendant, saying:

"The danger of injury which would obviously result from allowing one of his feet to project beyond the platform of the elevator in its ascension would, we think, be obvious to a youth of the age of fourteen, of ordinary capacity, which it appears the plaintiff was proved to be of.

And it can not be that it is the duty of the master to give his employe any express and particular instruction to guard against such dangers as are evidently obvious."

In *Probert* v. *Phipps* (Mass.), 21 N. E. Rep. 370, a boy of fifteen had worked in a silk mill about three weeks. In starting and stopping the machines about which he was employed, he had to go into a somewhat narrow space between them and throw a belt on or off a wheel. In doing so, he was caught by a part of the gearing, which projected and was rapidly revolving, and he was injured. He had no knowledge of machinery before entering this employment. He had also been warned by fellow-employes against getting caught in the gearing, but the court puts its decision upon the ground that the danger was obvious, and held the defendant not liable, saying:

"We think that it appears, from the testimony of the plaintiff himself, that the danger of getting caught in the gearing was obvious, and that he well understood what this danger was, and how it was to be avoided, and that it was from his own want of care that he was injured."

In the case at bar the appellee testified that he knew that if the machine was started while he was in the frame, that there was danger of being caught.

In *Buckley* v. *Gutta Percha*, etc., *Mfg. Co.*, 113 N. Y. 540, a boy about twelve years of age was employed to assist in operating a machine in a factory. He had been thus engaged about three days when, in attempting to put a cylinder in place, his foot slipped and he threw out his hand to save himself from falling, and thrust it into the cogs of some revolving wheels, about nine inches from the end of the cylinder, and the hand was crushed. The court said:

"It is idle to say that this plaintiff did not know as well as a grown man that if he placed his fingers between the revolving cogs he would be injured. * * * It is impossible to perceive how the absence of instructions had anything to do with this injury. He had been sufficiently

instructed by what he saw during the time he had been employed there. He had seen the machine operated and had worked about it. He had seen this cylinder removed by others, and had himself assisted in removing it. What further knowledge could have been given him by instructions it is impossible to discern. * * * We think it is preposterous to say that it was the duty of the employer to warn him not to put his fingers in between the cogs. It might as well be required to warn a boy twelve years old, who was working about boiling water or a hot fire, not to put his hand into the water or the fire. * * * There is no rule of law that a minor may not be employed about a dangerous machine, and the simple fact that a machine is dangerous does not make an employer liable for an injury received by a minor employed upon such machine. All the law requires is that the minor should be properly instructed as to the danger to which he is exposed, and if he is injured because he has not received such instructions, then, as a general rule, the employer may be held responsible. But where the minor is familiar with the machine, and its character and operation are obvious, and he is aware of and fully appreciates the danger to be apprehended from working the machine, the fact that he is a minor does not alter the general rule that the employe takes upon himself the risks which are patent and incident to the employment." *Stewart* v. *Patrick*, 5 Ind. App. 50, 30 N. E. Rep. 814; *Atlas, etc., Works* v. *Randall*, 100 Ind. 293; *Pittsburgh, etc., R. W. Co.* v. *Adams*, 105 Ind. 151; *Hickey* v. *Taaffe*, 105 N. Y. 26; *Sjogren* v. *Hall*, 53 Mich. 274; *Palmer* v. *Harrison*, 57 Mich. 182; *Anderson* v. *Morrison*, 22 Minn. 274; *Fones* v. *Phillips*, 39 Ark. 17.

Many other cases might be cited to the same effect. In reaching this conclusion, we do not overlook the rule that the master is liable for an injury resulting, if he employ one of immature judgment, and, without instruction, set him to perform service the peril of which, on account of

his immature age, he is incapable of appreciating, although visible; or, if being instructed and cautioned, his mind is so immature as not to be capable of understanding the instruction and warning. It is not always that instruction and warning will absolve the master. *Brazil, etc., Co.* v. *Gaffney,* 119 Ind. 455; *Brazil, etc., Co.* v. *Young,* 117 Ind. 520.

We do not think the facts of this case bring it within that rule. Even if it be a matter of doubt as to whether the appellants were guilty of negligence, we think, upon the conceded facts and admissions of appellee, that contributory negligence may be ruled as a matter of law.

Judgment reversed, with instruction to grant a new trial.

Filed May 23, 1893.