The Board of Commissioners of White County *v.* Gwin, Sheriff, *et al.*

No. 16,776.

THE BOARD OF COMMISSIONERS OF WHITE COUNTY *v.*
GWIN, SHERIFF, ET AL.

CIRCUIT COURT.—*Place of Holding.*— *What Constitutes a Court.*—The long practice uniformly acquiesced in all over the State, giving our statutes the construction that the circuit courts must hold their sessions at the county seat, amounts now to positive law, although there be no statute to that effect; and the officers of the court, the judge, clerk, and sheriff, being assembled at the time and place designated by law for the administration of justice, constituted a court.

SAME.—*Powers Incidental or Inherent.*—*Repairs.*—*Statute Construed.*— *Legislature.*—All the common law powers of a court of general jurisdiction, not locally inapplicable and inconsistent with our form of government, are vested in the circuit courts, subject only to the limitations of the constitution of the State and the constitution of the United States, and the laws and treaties made in pursuance thereof. These powers are called the incidental or inherent powers of the court, one of which is the power to make necessary repairs to the court room. This power, thus given, and as given by section 1416, R. S. 1881, is not inconsistent with article 3 of the State constitution. The Legislature has the authority to regulate the exercise of that power, so long as the act of regulation does not deprive the court of the power.

SAME.—*Repairs.*—*Power to Make.*—*Limitation of.*—*Reconstruction of Court House.*—The power to make repairs is limited to repairs in the sense of the necessity out of which the power springs, and does not exist to the extent of practically rebuilding or reconstructing the court house, or to the construction of permanent improvements such as extensions, additions, and enlargements to the court house.

SAME.—*Repairs, Order for.*—*When Void.*—*Collateral Attack.*—*Injunction.*—Where the court, under the guise of making repairs, makes an order which, if carried out, would amount practically to a reconstruction of the court house, providing for new additions and extensions, and a new foundation, leaving but a small portion of the old walls as a nucleus around which repairs may be made, such order is beyond the power of the court to make, and is null and void, and may be collaterally attacked by way of injunction.

From the White Circuit Court.

*W. Guthrie, W. S. Bushnell, R. P. Davidson* and *J. L. Lewis,* for appellant.

*J. H. Gould, G. R. Eldridge, E. B. Sellers* and *W. E. Uhl,* for appellees.

McCABE, J.—Suit to enjoin the appellees, the sheriff, auditor and treasurer of said county, and Charles Pearce and Thomas Morgan, contractors, from carrying out a certain contract entered into by said Gwin, as sheriff of said county, under the order of said circuit court on one side, and said Pearce and Morgan on the other, by which it was claimed by the appellant, that the old court house of the county was being, or about to be, demolished, and substantially a new court house was to be erected instead of the old at a cost of $32,087.50.   While it was claimed on the other hand that the carrying out of the contract was only making needed repairs of the court room.

There is really no material controversy about the facts, but the main dispute is about the law that governs the case.

It is alleged in the complaint, and the evidence shows, that on the 16th day of May, 1892, the White Circuit Court made and entered a finding and order condemning the court room as unsafe and unfit for further use in the following words:

"The circuit court, being duly advised, finds, that the court room in the court house of this county is so out of repair that it is unsafe longer to hold the sessions of court therein; that the plastering on the ceiling is loose and liable to fall upon persons in the court room engaged in business before this court; that the jury room is both unsafe and unfit for occupancy, and jurors, while deliberating, endanger their health and lives while remaining therein; that the walls of the court room are cracked; that the records of this court are not protected, and are

in danger of loss by fire, and the papers in causes pend-
ing are also in danger of loss by fire and otherwise; that
papers in cases disposed of, and which constitute part of
the records of this court, are kept in a damp and insuffi-
cient vault, where they are mildewing and rotting, and
will be lost unless removed from the place where they
are now kept; that there is insufficient room for the li-
brary, and no chambers for the judge, nor grand jury
room in said court house; that the belfry is unsafe and
liable to fall or be blown down, and thus the lives of
persons going to and from the sessions of this court are
endangered; that the roof over the court room is so out
of repair as to utterly fail to keep out rain, many of which
defects are patent, and others apparent upon investiga-
tion, and that no steps are being taken by the board of
commissioners to repair said court room so as to make it
fit for use.     It is, therefore, ordered by the court that
the court room now occupied by this court be, and is,
hereby condemned as unsafe and unfit for use until re-
paired."

On May 26th, 1892, the said court ordered said court
room repaired by an order modified on July 11th, 1892,
and entered of record as follows:

"In the matter of the circuit court room.     The court
having heretofore found that the present court room is
unsafe and unfit for the transaction of the business of
this court, it is, therefore, now ordered by the court that
said court room be repaired.     And the court now appoints
James F. Alexander & Sons, competent architects, to
submit plans and specifications for such repairs.

"And comes now said James F. Alexander & Sons,
and submits such plans and specifications, which are in
these words and figures, to wit: (insert).     And the court,
having examined the same, and being duly advised in
the premises, finds that said court room can be properly

repaired according to said plans and specifications, and can not be repaired so that the same will be safe and permanent by the adoption of any other plans and specifications. Wherefore, the court now approves and adopts said plans and specifications, and orders that said court room be repaired in accordance therewith.

"And it is further ordered that James P. Gwin, the sheriff of this county, proceed to cause said repairs to be made, and he shall employ persons to do said work of repairing said court room; such employment to be made in such manner as he shall see fit, and he shall superintend the construction of said repairs. The said repairs shall be completed on or before the 1st day of November, 1892, and upon the completion of said repairs the said sheriff shall report the fact to this court, and also certify the costs of such repairs and the person or persons to whom the costs thereof are due, for allowance, as provided by law. And said court does now appoint James F. Alexander & Sons, architects, to inspect said work and make all proper estimates during the progress of said repairs.

"And comes James P. Gwin, sheriff of this county, and reports to the court that in pursuance to the order in this matter he has employed Pearce & Morgan to make the necessary repairs to the circuit court room hereinbefore ordered, and taken from them a bond conditioned for the faithful performance of said work and the protection of this county against loss, which acts of said sheriff are approved by the court. And all persons are forbidden and prohibited from in any way hindering or delaying the progress of said repairing, and from interfering with said sheriff or any person or persons employed by him or acting under him while engaged in the making of said repairs; and the sheriff is ordered to remove at once from the court room all the furniture and fix-

tures therein, so that work of repairing may begin immediately.''

It is further shown that the court ordered the said sheriff to procure another room in the town of Monticello in which to hold court, which was done, and the court and its records moved out of said court house, and to the building thus secured to be occupied and used as a court room while the work contemplated was being done.

It is further alleged in the complaint, that about the year 1850 the board of commissioners of White county built the court house now in question, in the upper part of which is the court room, giving a minute description of the building, the original cost of which is stated to be but $10,000, while the contract price of the work contemplated in the order as reduced by the modification is $32,087.50, with a liability under the order allowing the court and architect to change the plans and specifications to reach many thousands of dollars more; that no additions had ever been made thereto, and that said court house, as originally constructed in the public square at the county seat, was a substantial two-story brick court house, 70 feet long by 48 feet wide and 30 feet high, surmounted by a wooden belfry 10½ feet square and 25 feet high, containing on the first floor offices and vaults for the clerks, auditor, treasurer, and recorder, and on the second floor a large and commodious court room and a small jury room, which court room and offices had been continuously used by the officers and courts up to July 12th, 1892; that appellant had repaired it from time to time; that the plans and specifications require the tearing away of so much of the old building as to constitute a practical destruction of it and a remodeling and reconstruction thereof; that the contract was entered into without the plans and specifications having been first

The Board of Commissioners of White County *v.* Gwin, Sheriff, *et al.*

filed in the office of the county auditor, and without having advertised for bids.

The material parts of the appellees' answer are as follows:

"That the court house at Monticello, White county, Indiana, was, and still is, the only place in said county provided for and as a place of holding the sessions of the circuit court of said county; that on the 16th day of May, 1892, and long prior thereto, said building was out of repair, to wit, that the plastering on the ceiling of the court room was loose and liable to fall upon persons in the court room engaged in business before the White Circuit Court; that the foundation of said building was and is defective in this, to wit, that the part thereof under ground is composed of boulders laid too loosely and not to sufficient depth to give the required strength to sustain the walls built thereon, and because of said defective foundation, the walls of said building have settled and cracked, and will fall to the ground, unless they are strengthened and supported; that, to sustain said walls from below, it is necessary to place thereunder a sound and secure foundation of cut stone and cement, and to hold said walls in place, and prevent them from splitting and falling outward, it is necessary to give them lateral support, by the erection against the same of the additional walls contemplated by the contract of the defendants Pearce & Morgan; that by placing under the walls a new foundation, properly constructed, etc., which can be easily done under the contract of Pearce & Morgan * * without removing or in anywise impairing said walls, and by the erection of said additional walls, said building would be given sufficient strength, and securely held in place, and that unless said walls are so strengthened and supported as aforesaid, it would be impossible to make the repairs that are necessary to the court room,

which occupies the second story of said building, and which is the only room provided for the holding of the circuit court of said county; that because of the insecure and dilapidated condition of the walls of said court room, hereinbefore mentioned, the same is unsafe and dangerous, in this, to wit, that they are liable to give way and fall at any time upon the persons who may be in or near said building, and because of the dangerous condition of said walls the said court room can not longer be occupied or used as such; that the roof leaks, rendering it unfit for occupancy; that many of the rafters and other timbers supporting said roof, and joists supporting the ceiling and floor of said court room, have, by reason of age and exposure to wet, become rotten, and thereby weakened to such an extent that they are liable to give way and fall at any time, and kill or injure persons that might then be in said building; that, by reason of the cracking and spreading of the walls, the joists of the ceiling and floor of the court room did and do not rest in or upon the walls of said room, and none of said joists have sufficient rest or footing in or upon said walls to securely support the same, and are liable to fall and endanger the lives of persons in said building and court room.''

We have set out the substance of the complaint and answer, and the order of the court, so as to exhibit the version of each party as to the nature of the power exercised by the circuit court in ordering what it denominates repairs of the court room.

It appears from all these averments, and from the plans and specifications, which are a part of the record of the order, that the work contemplated therein will be the construction of a new foundation and basement of cut stone, bearing no resemblance to the old foundation; large portions of the old walls are to be destroyed and

taken away, and those that are left to remain are to be supported by new walls, so as to support and keep them from falling. The joists, floors, and ceilings are to be made new throughout. The roof and rafters are to be made new. The windows and doors are to be made new. The inside finishing is to be made new. There are extensions and additions to be constructed beyond the dimensions of the old building; there are rooms and apartments to be added that were not in the old building. Indeed, about all that will remain of the old building, when the plans and specifications are carried out, will be so much of the old walls as are to be left standing, and that part of the brick that comes out of the old demolished walls that are sound, and which, by the specifications, may be used in the new walls for back filling.

Issue was joined, and the court below, after hearing the evidence, found for the appellees, and rendered judgment in their favor over a motion for a new trial.

About the only point on which it can be said that there was any conflict in the evidence was as to the alleged dangerous condition of the building. As to the nature of the work to be done under the order of the court, there was no conflict.

It is contended by the appellee, that this is a collateral attack on the adjudication of the court, by which the necessity and order for the work was adjudicated. And it is contended that mere errors and irregularities in the order are unavailable on such an attack.

We have no doubt, if the circuit court had the power to make the order, that this attack thereon, being collateral, must fail. *Bass* v. *City of Fort Wayne,* 121 Ind. 389.

The first inquiry which appellees' contention suggests is this: Was the order made by a court at all? A court is defined to consist of persons officially assembled at a

The Board of Commissioners of White County v. Gwin, Sheriff, *et al.*

time and place appointed by law for the administration of justice. *In re Allison,* 16 Am. St. Rep. 224, 13 Col. 525; *Dunn* v. *State,* 35 Am. Dec. 54, 2 Ark. 229; *Levey* v. *Bigelow,* 6 Ind. App. 677.

It appears from the record of the order, that when it was made, the proper persons, namely, the clerk, sheriff and judge of the White Circuit Court had assembled at the time appointed by law for holding said court. The place where they assembled was within the county and within the county seat of said county of White. But there is no statute fixing the place for holding the White Circuit Court at any particular point in the county. Indeed, we have been unable to find any statutory or constitutional provision fixing the place in any county where the circuit court should be held, from the organization of the State to the present time. The nearest approach to such a provision is section 24 of the act of 1838, for the regulation of county business, which provides that ''The circuit courts in counties where court houses shall not have been erected, shall be holden for the time being, at the place designated by law or selected by the court.'' R. S. 1838, p. 155.

There has always been a provision that the circuit court of each county should be held in the county, but none that such courts should be held at the county seat or even in the court house, or at any other particular place in the county. Yet no one can doubt that it is the law that circuit courts shall be held at the county seats of the various counties.

A large number of statutes proceed upon the idea that the county seat is the local habitation of the circuit court, yet none of them so expressly provides.

Among them is section 5844, R. S. 1881, passed in 1853, relating to the clerk of the circuit court and providing that: ''Such clerk shall keep his office open at

the county seat, in a building provided for that purpose by the board of commissioners of the county, every day in the year (Sundays and the Fourth of July excepted), between the hours of 9 A. M. and 4 P. M., where, by himself or deputy, he shall attend to the duties of his office not otherwise provided for.''

The statute providing for posting advertisements of, and the place where, judicial sales are to be. made, and many others, tend to show the intention to have been that circuit courts shall be held at the county seat. Rather, it has been assumed by each Legislature that such a law had already been passed.

In construing statutes, the whole system must be looked to, and statutes upon cognate subjects may be referred to, though not strictly *in pari materia,* to ascertain the meaning of any particular part.   Sutherland Stat. Con., section 284.

Other statutes and the general principles of law will be considered in construing statutes.  *Crawfordsville, etc., Turnpike Co.* v. *Fletcher,* 104 Ind. 97; *Stout* v. *Board, etc.,* 107 Ind. 343; *City of Evansville* v. *Summers,* 108 Ind. 189; *State, ex rel.,* v. *Harrison,* 116 Ind. 300.

It was held by this court in *Board, etc.,* v. *Bunting,* 111 Ind. 143, that though there was no statute authorizing the county board to provide a sheriff's residence, yet as the statute made it the duty of the county board to provide and maintain a county jail, and enjoins on the sheriff the duty to keep the jail; and, inasmuch as it had always been the custom of boards of county commissioners to make suitable provision for the sheriff's residence, that this custom had given a construction to the law which could not be disregarded, even if there was doubt as to the meaning of the statute.

This court, in that case, said:  ''In speaking of a practical construction  given to a statute the Supreme Court

of Illinois said:    'It has always been regarded by the courts as equivalent to a positive law.' *Bruce* v. *Schuyler*, 4 Gilm. 221.    By another court the principle was stated, and it was said:    'We can not shake a principle which, in practice, has so long and so extensively prevailed.' *Rogers* v. *Gooden*, 2 Mass. 475.    There are many cases which declare and enforce this principle; among them are *Stuart* v. *Laird*, 1 Cranch, 299; *Martin* v. *Hunter*, 1 Wheat. 304; *Cohens* v. *Virginia*, 6 Wheat. 264; *Ogden* v. *Saunders*, 12 Wheat. 213 (290); *Minor* v. *Happersett*, 21 Wall. 162; *State* v. *Parkinson*, 5 Nev. 15; *Pike* v. *Megoun*, 44 Mo. 491; *People* v. *Board, etc.*, 100 Ill. 495; *State* v. *French*, 2 Pinney (Wis.), 181.''

It has been the universal custom to hold the circuit courts at the county seats, without exception, from the organization of the State to the present time, under an interpretation of the statutes that they imperatively required the court to be so held.    This long acquiescence in such a construction is equal to positive law, requiring such courts to be so held.    Sutherland Stat. Con., sections 308, 309; *State, ex rel.*, v. *Harrison, supra.*

Likewise, the statute requires the county commissioners to erect a court house, jail, and public offices for the clerks, recorder, treasurer, and auditor, where the same has not been done; shall keep the public buildings of the county in repair; and such offices, if practicable, shall be made fire-proof, and shall be occupied by such officers respectively.    R. S. 1881, section 5748.

But there is no provision, unless in a special act for removal of county seats, requiring such court houses or other public building to be built at the county seat, yet the universal practice, without a single exception, has been that court houses and other public buildings connected with the courts or the administration of justice have been erected at the county seat.

The Board of Commissioners of White County v. Gwin, Sheriff, *et al.*

The act of 1875, providing for the various duties of county, boards in relation to the construction of court houses and other public buildings of the county, makes no provision that court houses are to be built at the county seat. And yet, in view of the long and uniform practical construction given to these statutes, amounting now to positive law, if the board of commissioners were to attempt to erect a court house at the expense of the county, at any other place than the county seat, such attempt would be illegal, and their acts in furtherance thereof would be void and liable to be enjoined. So, too, in case the circuit court should convene at any place outside of the county seat, the acts and proceedings at such other place would be void.

The constitution of 1816 provided for a Supreme Court and circuit courts. Section 6, article 4, constitution of 1816, General Laws of Indiana, from 1816 to 1817. This court was organized by act approved December 23d, 1816. That act provided that the place of meeting of this court should be at the court house at the seat of government. That had reference to the town of Corydon, in Harrison county. That constitution was repealed and superseded by the constitution of 1851, and there has never been any statutory or constitutional provision fixing a place for this court to meet and hold its sessions from that time to this. But it has been the universal custom and practice for this court to meet and hold its sessions at the capitol of the State, with as much regularity as if there had been a statute of the State imperatively requiring such meetings and sessions at the State capitol. That practice has been so long continued, and the construction of our statutes relating to the same has been so long acquiesced in and accepted as unquestioned by everybody, and all the departments of the State government, that it amounts now to positive law that the State capitol is the only law-

ful place where this court can assemble to take judicial action. The more recent statutes organizing courts have provided where the same should be held. The act providing for superior courts provides that they are to be held at the county seat and in the court house, unless the county board furnish some other place for them to be held in the county seat. The act in relation to criminal courts makes a similar provision. The act creating the appellate court of this State provides for holding its sessions at the capitol of the State.

It follows, from the principles above announced, that by long practice uniformly acquiesced in all over the State, giving our statutes the construction that the circuit courts must hold their sessions at the county seat amounts now to positive law, and that the White Circuit Court, when it made the order in question here, was lawfully assembled at the time and place designated by law for the administration of justice, and was, therefore, a court.

These principles of construction will apply to a far more important phase of the case further on.

It is further contended by the appellant, that the circuit court being clothed with powers belonging to one department of the State government only, namely, the judicial, it can exercise no power not judicial in its nature, and that it is beyond the constitutional authority of the Legislature to confer any such power upon that court; and it is contended that the power to make the order in question is not judicial, but is administrative or ministerial.

The constitution divides the powers of the government of the State "into three separate departments; the legislative, the executive, including the administrative, and the judicial; and no person charged with official duties under one of these departments shall exercise any of the

functions of another, except as in this constitution expressly provided." R. S. 1881, section 96.

Therefore, the appellant contends that even though the Legislature may have attempted to confer the power on the circuit courts to repair their court rooms, such legislation is in conflict with the constitutional provision just quoted, because the power is not judicial, but is administrative or ministerial, and can not be exercised by the judicial department.

We have already seen that such power has been expressly conferred on the board of commissioners, by section 5748, R. S. 1881.

The appellees claim that section 1482, 1 Burns' Rev. 1894, R. S. 1881, section 1416, also confers the power on the circuit courts. It reads as follows: "The said courts may also allow such sums as may be due to persons furnishing fuel used in term time, or furniture for the court room, or making repairs thereof."

It is also contended on behalf of the appellees, that the circuit court is possessed of this power independent of the Legislature, as one of the incidental or inherent powers of the court as a judicial tribunal, of which the Legislature could and can not deprive it.

An eminent author says that "Judicial power as contradistinguished from the power of the law has no existence. Courts are mere instruments of the law. Judicial power is never exercised for the purpose of giving effect to the will of the judge, always for the purpose of giving effect to the will of the Legislature, that is, to the will of the law." Hawes on Jurisdiction of Courts, section 4.

"When they [the courts] are said to exercise a discretion, it is a mere legal discretion, a discretion to be exercised in discerning the course prescribed by law; and when that is discerned, it is the duty of the court to

follow it." *Ib.*, section 29; *Osborn* v. *United States Bank*, 9 Wheat. 737 (866).

The State constitution further provides that "The judicial power of the State shall be vested in a Supreme Court, in circuit courts, and in such other courts as the General Assembly may establish." 1 Burns' Rev. 1894, section 161.

And that "The State shall, from time to time, be divided into judicial circuits; and a judge for each circuit shall be elected by the voters thereof. He shall reside within the circuit, and shall hold his office for the term of six years, if he so long behave well." 1 Burns' Rev. 1894, section 169.

These constitutional provisions make the circuit courts, when organized, constitutional tribunals; but if nothing else existed in the way of constitutional provision or legislative enactment, the circuit courts would have nothing but an imaginary existence, an existence only in legal contemplation, but no real potential existence.

Brown on Jurisdiction says: "Courts may be established and their jurisdiction defined by the constitution or organic law of the State, or by legislative enactment. Generally, however, jurisdiction proceeds from statutory power granted, except where it is given by the constitution, of which the Supreme Court of the United States is an example; and the statutes prescribe the manner in which the court shall be conducted and the form and procedure, and appoint or provide for the appointment or election of judges and subordinate officers, as well as the method or rules of procedure governing them. There are no courts in this country except those so created." Brown Juris., section 12.

In *Levey* v. *Bigelow, supra*, the appellate court said: "A court has been defined as 'a place where justice is judicially administered.' Coke Litt. 58; 3 Bl. Com. 23.

This definition, however, has been often criticised as too narrow, being limited by the word place. The prominence of the word place, in this definition, no doubt arises from the ancient idea that the king was the fountain and dispenser of justice, and wherever he was domiciled was a court or place where justice was dispensed. In modern times, and under our form of government, the judicial power is exercised by means of courts. A court is an instrumentality of government. It is a creation of the law, and in some respects it is an imaginary thing, that exists only in legal contemplation, very similar to a corporation. A time when, a place where, and the persons by whom judicial functions are to be exercised, are essential to complete the idea of a court. It is in its organized aspect, with all these constituent elements of time, place, and officers, that completes the idea of a court in the general legal acceptation of the term. But a court may exist in legal contemplation, without any officers charged with the duty of administering justice."

It is by legislative enactment alone that these constituent elements of the circuit court of this State have been brought into existence, and thereby the Legislature has called into being the actual and real existence of the circuit courts of this State, as contradistinguished from their existence solely under the constitutional provisions quoted above.

The Legislature has made them courts of general jurisdiction. Burns' Rev. 1894, section 1366; *Barkley* v. *Tapp*, 87 Ind. 25.

The common law having been adopted by the Legislature before the State was organized, and while it was a territory, which has been reënacted and continued in force ever since, all the common law powers of a court

of general jurisdiction, not locally inapplicable and inconsistent with our form of government, are vested in the circuit courts by virtue of their creation as before stated, and by virtue and force of the common law in force in the State when they were called into existence by the Legislature, subject only to the limitations of the constitution of the State and the constitution of the United States, and the treaties and laws made in pursuance thereof.

One of the limitations of the constitution of the State is that the courts are inhibited from exercising any power but judicial, and, therefore, are forbidden from exercising administrative or ministerial powers as courts.

Ordering and paying for repairs of their court rooms is ministerial or administrative.   *Board, etc.,* v. *Cottingham,* 56 Ind. 559;   *McCormick* v. *Board, etc.,* 68 Ind. 214;   *Crow* v. *Board, etc.,* 118 Ind. 51, and authorities there cited; *Patton* v. *Board, etc.,* 96 Ind. 131.

But courts of general jurisdiction were, by the common law, clothed with what was known as incidental or inherent power.   The power to punish for contempt belongs to this class, and it is to be noted that the law writers and courts nearly always designate it as the *power* of the court, and scarcely ever call it *jurisdiction* to punish for contempt.   Brown on Juris., section 115a;   Hawes on Juris., Sections 221, 223.

The common law authorized courts to exercise this power not because it was judicial in the strict sense, but because it was absolutely essential for the maintenance and preservation of the dignity, authority, and jurisdiction of the court.   See same authorities.   Because self-preservation is said to be the highest law of nature.

The courts and law writers all agree that "the power to hear and determine a cause is jurisdiction."   Brown on Juris., section 1, p. 2;   *Quarl* v. *Abbett,* 102 Ind.

233; *Lantz* v. *Maffett*, 102 Ind. 23; Hawes on Juris., sections 1, 2.

But the power to hear and determine a contempt is never spoken of as a constituent element of the power to punish for such contempt; it is rather essential that the court have jurisdiction to hear and determine some cause and be engaged in the exercise of such jurisdiction as a condition and constituent element of its power to punish for contempt.   See Brown on Juris., section 115a, and authorities there cited; Hawes, *supra.*

It follows that it is out of absolute necessity that this inherent power to punish for contempt springs, and not out of the general jurisdiction of the court to hear and determine causes generally.   Because, says Hawes on Juris., *supra,* "The power of the court to punish for an alleged contempt of its authority, though undoubted, is, in its nature, arbitrary, and its exercise is not to be upheld except under the circumstances and in the manner provided by law."

The power to repair the court room of the circuit court is akin to the power to punish for contempt.   Like the power to punish for contempt, it springs out of absolute necessity, out of that highest law of nature, self-preservation, and does not belong to the general jurisdiction, but is incidental to such jurisdiction, and is inherent in the court, and was so when the circuit courts were first called into existence by the Legislature.

Brown on Juris., section 14, says:   "Where jurisdiction is conferred on a court by the constitution, the Legislature may, nevertheless, regulate the mode and manner of its exercise, and such legislative enactment will be obligatory unless it practically deprives the court of the power granted."

Whether this inherent power to repair the court room was conferred by the Legislature or the constitution is

unimportant to inquire, as in either case the Legislature has the authority to regulate the exercise of that power so long as the act of regulation does not deprive the court of the power. The section of the statute already quoted regulates the exercise of that power without impairing it. It is, however, to be observed that as circuit courts were in existence in the State as courts of general jurisdiction invested with these inherent powers when the constitution was adopted, the presumption arises that it was the intention of the framers of that instrument that such courts should continue to be clothed with such inherent and incidental powers. *State, ex rel.,* v. *Noble,* 118 Ind. 350.

Therefore, section 1416, of the statutes, *supra,* conferring and regulating the power of circuit courts to repair their court rooms is not in conflict with section 1, of article 3, of the constitution, already quoted, forbidding persons charged with official duties under one of the departments of the State government from exercising any of the functions of another, except as otherwise expressly provided in the constitution. Such is the construction the statute and constitution has received. *Board, etc.,* v. *Thompson,* 7 Ind. 265; *Nash, Aud.,* v. *State, ex rel.,* 33 Ind. 78.

If there were any doubts as to the correctness of this construction, the great length of time it has been received and acted on, according to the principles already laid down, gives to it the force of positive law. There is no necessity for the exercise of any power beyond repairs by the circuit courts. Both the power to repair and to build court houses has been wisely conferred upon the board of commissioners in the exercise of the large administrative and ministerial powers constitutionally vested in that body by the Legislature. And the exclusive power to build court houses, and other county

buildings, has been vested by the Legislature in such county boards.

But a door may be broken down, by casualty or otherwise, leading to and from the court room, so as to interfere with the due administration of justice therein, or a window broken out with like effect, or furniture destroyed, or any other circumstance that transpires, by which the court room is so impaired in its usefulness as to materially interfere with the due administration of justice therein; the inherent power of the court ought to, and does, exist to afford temporary relief for the time being to order and pay for such repairs as will enable the court to continue the due administration of justice therein.    But it is contended that, even if this inherent power does exist, it is not an unlimited power, and must be confined to repairs in the sense of that necessity, out of which the power springs; and that it does not exist to the extent of practically rebuilding or reconstructing the court house, or to the construction of lasting and permanent improvements, such as extensions, additions and enlargements to the court house.

We are of opinion that this contention must prevail because such is the law.

But it is contended by the appellees, on the other hand, that if the power to repair existed at all, and the White Circuit Court, in its attempt to carry such power into execution, erred and went beyond what might be termed legitimate repairs, it was a mere error in judgment, a mere irregularity that did not affect the jurisdiction, and that such error and irregularity could not be inquired into in this collateral way.

Counsel say that:    "The finding of the court, and the decree of the court, is directed to the repairs of the court room, and it finds that every part of it is necessary and proper in the making of said repairs."

If the epithets and names freely applied in the order complained of could give it a fixed character which would be conclusive upon the courts, then the order here in question has conclusively adjudged the subject thereof to be repairs of the court room, pure and simple; because, in that short order, the word "repairs" and "repaired" are used no less than twenty times. Then, in addition to the details of the dangerous dilapidation of the old court house, set forth in the order, the fact that the commissioners were taking no steps to repair it is made prominent in the order, though they had ample notice of its condition.

Brown on Jurisdiction, section 26, says: When recitals in the record show any facts which negative the jurisdiction of the court, then the record is self impeached.

This was a suit in equity. Equity looks at the intent rather than the form; it always attempts to get at the substance of things, and to ascertain, uphold, and enforce rights which spring from the real relations of parties. It will never suffer the mere appearance and external form to conceal the true purposes, objects, and consequences of a transaction. 1 Pom. Equity Jur., section 378.

We have already seen that when the plans and specifications made a part of the order are carried out, there will be left standing only a very small part of the old building, a small portion of the old walls; everything else will be new, and there will be additions and extensions, all of which will be entirely new. It is manifest, from the face of the record of the order, that the intent was to come as near building a new court house as possible, and yet retain any semblance of repairs.

It is quite manifest from the order, that the only reason that any portion of the old dilapidated wall was

retained, was to furnish a nucleus around which repairs could be made with some plausibility, and so that the court might be able to say that the work ordered was repairs.

The work contemplated and described in the plans and specifications can not be denominated "repairs," with any regard to accuracy of expression, as we shall hereinafter see. But if a part of the work ordered were legitimate repairs which the court had power to make, yet the whole is so blended as to be unseverable, which places the whole beyond the jurisdiction of the court. Freeman on Judgments, section 120c; Van Fleet's Col. Attack, 739.

It is also manifest from reading the record of the order, that had the court felt assured that it possessed the power to rebuild the court house, it would have done what all must agree ought to have been done, namely, demolished the entire building and built an entirely new court house on the old site. It would not have gone through the unseemly process of "sewing new cloth onto an old garment or putting new wine into old bottles." 2 Mark, 22.

The old building originally cost but $10,000, and was, at the time, worth about $7,000. Probably an entirely new court house could have been built for the $32,087.50, the contract price of the alleged repairs.

If the appellants had courageously performed their duty and built a new court house, before their neglect had driven the judge of their circuit court into extreme measures, they would have saved their county from much needless expense and loss. But however overwhelming the evidence may establish that an entire new court house was imperiously demanded, yet if the White Circuit Court had no power to build one, or had no power to do what it attempted to do, that consideration

can not add to or enlarge the power of the court so as to justify the act.

Counsel for appellees ask: "Must the court remain in a dangerous structure until it falls upon it and destroys the lives of the persons constituting it? Can not the court anticipate calamities by provident use of human skill? Must a court wait until a judge is killed or maimed before resorting to that highest law, self-protection? Is it not within the power of the court to protect itself against * * a veritable death trap?"

We answer the first of these interrogatories in the negative; the second, in the affirmative; the third, in the negative, and the fourth, in the affirmative.

The court is not bound to remain in a dangerous structure until it falls and destroys the life of judge or officers. It can anticipate such calamities by provident use of human skill. It is within the power of the court to protect itself against such a veritable death trap as the court house in question seems, from the evidence, to have been. All these things granted, and it does not follow that that power will enable the court to build additions and extensions to such death trap, and thereby and therein expend over $32,000 of the public funds of the county to hold up a death trap, the whole value of which does not exceed $7,000, under color of repairs.

Under the circumstances disclosed in the evidence, the court could have protected itself precisely as it could and would have done if the old court house had blown down or burnt up. No one would have thought of an attempt on the part of the court to rebuild it, but the court would at once have secured another room, as it actually did do, for temporary use in the administration of justice, until the proper authority could rebuild the court house.

In support of the claim that the extraordinary power attempted to be exercised here was one which belonged

to the circuit court, counsel assert that "The judiciary of Indiana is entirely independent of any power on earth, except the power of the people, independent even of them, except that the people might change the constitution, and in the exercise of that power the people could not abolish either the judiciary or its inherent powers without conflicting with the constitution of the United States."

This proposition is too broad. It is true the judicial department is independent of the other two departments. The constitution erects a State government, clothed with the sovereign power of the people, and divides that power into three distinct departments, to be exercised in each exclusively by the officers of that department. In that sense alone the several departments are independent of each other. *Wright* v. *Defrees*, 8 Ind. 298; *Lafayette, etc., R. R. Co.* v. *Geiger*, 34 Ind. 185; *Hovey, Gov.*, v. *State, ex rel.*, 127 Ind. 588.

The judicial department is no more independent of the legislative and executive departments than each of them is independent of the judicial department. *Smith* v. *Myers*, 109 Ind. 1.

The three departments being invested with the entire sovereignty of the people, and constituting the State government, are not so independent of each other as that those in authority in one department can ignore and treat the acts of those in authority in another department, done pursuant to the authority vested in them, as nugatory and not binding on every department of the State government. And to that extent does the appellees' contention go, as we understand it. What is meant by the independence of the judicial department is that it may exercise its functions of expounding and enforcing law in the administration of justice, and that no part of these functions can be exercised, either directly or indi-

rectly, by either the Legislature or the executive, indeed that those in authority in the other departments can not even so much as cross the line dividing the domain of the judicial from the other departments to make a suggestion as to how the judicial department shall perform its functions, or what kind of judgments or decrees it ought to render, or what exposition it shall give to the laws.

But when the judicial department has rendered its decree, and thereby given an exposition and construction of the law, such decree and construction is binding on both the other departments. And so, too, when the Legislature is exercising its functions of making laws, those in authority in the judicial department can not take any part in the exercise of those functions; they can not even cross the line dividing the judicial from the legislative domain to make a suggestion as to how the Legislature should perform its functions, or what kind of laws it should make. *Smith* v. *Myers, supra.*

Indeed, the judiciary can not make laws at all, whether in or out of their domain. But when the Legislature has enacted laws that are not unconstitutional, they are absolutely binding on the judicial, as well as the executive department, no matter how unwise and impolitic they may be. *Smith* v. *Myers, supra; State, ex rel.*, v. *Noble, supra; Ex parte Griffiths,* 118 Ind. 83.

Such laws are also binding on all the departments until they are repealed.

To hold that the judiciary is so far independent of the legislative department that it may disregard and treat as nugatory legislative enactments passed in conformity to the constitution, is not only to draw the whole sovereign power of the State government into the judiciary, and thus destroy the independence of the other departments, but it erects a despotism which appellees contend

can not be abolished, even by the people. Such a proposition is utterly untenable, because it not only violates the constitution, but is destructive of the State government and the essential principles upon which it is founded. While each department, in its own bounds, exercises its powers independently of each of the other departments, yet each department is bound by the acts of each of the others done within the limits set by the constitution to such powers.

Appellee, however, contends, substantially, that the inherent power already vested in the circuit court was extensive enough to warrant and justify the court in all that the order proposed to have done. They cite *Nash* v. *State, supra,* and *Board, etc.,* v. *Thompson, supra.*

As a recognition of that power, they also claim that the statute above cited is also a recognition of the existence of the power. But the last case is rather against the position assumed, it holding that the circuit court could not move a court house. The other case was simply a claim for furniture furnished to the court room and paid for by the court. Such payment was upheld by the statute already quoted.

The appellee's learned counsel cite two cases which deserve notice; the first is *Beach* v. *Crain,* 2 N. Y. 86, where plaintiff granted to defendants a right of way over his land, and covenanted to erect a gate at the terminus, and in the same instrument the defendants covenanted to keep the gate in repair. It being removed by some unknown person, it was held that the covenant imposed the duty on the grantee to put up a new gate, likening it to the obligation of a tenant to repair, and in case of destruction to rebuild. The other case was *Brecknock* v. *Pritchard,* 6 T. R. 750, where the covenant required the defendant to keep a bridge in complete repair for seven years, the bridge, having been washed away, he was held

liable to rebuild the same.   If these cases are applicable and controlling, we must then hold that the real purpose disclosed in the order was within the power of the court, and that the incidental power of the court to repair its court room carries with it necessarily the power in case of its destruction, or, becoming unfit for use, to build a new court house.

But there are many reasons why these cases are not in point.   In each case there was a contract imposing the duty solely on one person to keep in repair.   Here there was no contract obligation, but a mere discretionary power or privilege was vested in the court for temporary self protection, extending no farther than that temporary protection required; but the primary duty, as we have seen, was devolved on the county board to keep the court house in repair and the exclusive power to rebuild.

In a case much more in point, and nearly parallel— indeed, exactly parallel with the case at bar as to the extent of the power conferred—where a duty to repair is imposed by law, was decided by this court, and a conclusion was therein reached contrary to that reached in the cases above referred to.

It was said by ELLIOTT, J., speaking for the whole court in that case, that:   ''We are unable to resist the conclusion that the trustee, under color of making repairs and removing obstructions, has changed and improved the ditch in several essential particulars.   The ditch has been greatly widened and deepened, and, doubtless, much improved, since the amount expended is almost twice the cost of the original ditch.   The inference from the facts stated is that the trustee has improved the ditch instead of repairing it.   Under authority to repair there can be no enlargement and improvement, except in so far as the work of repairing necessarily enlarges and improves.   'Repair,' says the Supreme Court of Pennsyl-

vania, 'means to restore to sound or good condition, after injury or partial destruction.' *Pittsburgh, etc., R. W. Co.* v. *Pittsburgh,* 80 Pa. St. 72. The authority of the township trustee was to restore the ditch as nearly as practicable to its original condition, not to enlarge or improve, no matter how much the improvement may have been needed, nor how much property-owners may have been benefited." *Weaver* v. *Templin, Tr.,* 113 Ind. 298.

The same principle was asserted by this court in *Western, etc., Co.* v. *Citizens, etc., R. W. Co.,* 128 Ind. 534, where it was said: "The obligation to repair a street is one thing, and the obligation to construct a street is another and different thing. To repair a thing is to restore it to a sound state after decay, injury, dilapidation, or partial destruction. To reconstruct is to construct or build again. One who only assumes an obligation to repair a house could not be required to tear it down and rebuild it."

So the weight of authority seems to be that the power to repair does not carry with it or imply the power to rebuild or reconstruct.

While there is, as before observed, no precedent upholding the extension of the incidental power of a court to repair its court room to the construction or reconstruction of a court house, there is respectable authority against such extension, in the following cases: *Commissioners, etc.,* v. *Stoddart,* 13 Kan. 207; *Barnett, Sheriff,* v. *Ashmore, Aud.,* 31 Pac. Rep. 466.

This incidental power has existed as long as courts of general jurisdiction have existed under the English common law. The strongest reason why it does not extend to building court houses, or the equivalent thereof, is found in the fact that not a single precedent can be cited upholding such a power, though numerous occasions

have existed in this country for a century, calling for the assertion thereof.

If such a power had existed, the researches of appellee's learned counsel through all the course of the common law would have been rewarded by the discovery of precedents for its exercise in the construction of court houses by the courts of general jurisdiction.

We have already seen that a practical construction given to a statute by public officers of the State, and acted on by those interested, the people and the courts, for a very great length of time, is always regarded by the courts as equal to positive law. See the authorities above cited on this point; also, *State, ex rel.*, v. *Harrison, supra; Board* v. *Bunting, supra.*

Mr. Endlich, in his valuable work, says: "It has been sometimes said, indeed, that usage is only the interpreter of an obscure law. * * * Said Lord Campbell * * * there would be no safety for property or liberty if it could be successfully contended that all lawyers and statesmen have been mistaken as to the true meaning of an old act of parliament." Endlich Int. Stat., section 358.

We therefore conclude that the White Circuit Court had no jurisdiction or power to make the order in question, and that it was void, and therefore subject to collateral attack by way of injunction. Therefore, the finding of the trial court was contrary to law.

The judgment is reversed, with instructions to the trial court to grant a new trial.

Filed Jan. 23, 1894.