ATTORNEY GENERAL, *ex rel.* GIBSON, *v.* BOARD OF SUPERVISORS OF MONTCALM COUNTY.

1. COUNTIES—COUNTY BUILDINGS — REPAIR AND RECONSTRUCTION.
    A court-house having been destroyed by fire, the board of supervisors passed a resolution purporting to provide for the repair of the same. The plans and specifications for the work contemplated the retention of only the outside containing walls of the old building, and even they were to be reduced in height, entirely removed at the portico in front of the building, and strengthened at the bottom by a new four-inch brick wall, and flushed with cement. Only such portions of the outside walls were to be retained as were "solid, safe, and not damaged and stand erect." The portico was to be entirely new. The entrance to the building, the hallways, windows, and doors, and arrangement of rooms were all to be changed, and other changes made. *Held*, that the action of the board of supervisors contemplated in effect the erection of a new structure, and was invalid, in the absence of a two-thirds vote in its favor.

2. SAME—DESTRUCTION BY FIRE.
    Section 2480, 1 Comp. Laws, limiting the amount to be expended by the board of supervisors in repairing county buildings to $500 in any one year, unless authorized by vote of the electors of the county, applies only to repairs made with money realized by a tax or loan, and does not apply to the

repair of a building destroyed by fire, the expense of which is borne by the insurance fund realized on the destruction of the building.

3. SAME—USE OF INSURANCE MONEY.

The board of supervisors may use insurance moneys collected on the injury or destruction of a public building belonging to the county, either to repair or rebuild such building without submitting the question to the electors, but such action must be sanctioned by the votes of two-thirds of all the members elected to the board. Sections 2484, 2485, 2543, 2544, 1 Comp. Laws.

4. CERTIORARI—BOARDS OF SUPERVISORS—JURISDICTION—CIRCUIT COURT COMMISSIONERS.

A circuit court commissioner has authority to allow a writ of certiorari to review the proceedings of a board of supervisors in reference to the rebuilding of a court-house.

5. SAME—PARTIES—ATTORNEY GENERAL.

Certiorari to review the proceedings of a board of supervisors with reference to the rebuilding of a court-house are properly instituted by the attorney general.

Certiorari by John E. Bird, attorney general, on the relation of Frank S. Gibson, to review the proceedings of the board of supervisors of Montcalm county with reference to the reconstruction of a county building. Submitted October 21, 1905. (Docket No. 253.) Proceedings quashed October 31, 1905.

*Allen B. Morse, C. L. & C. B. Rarden, E. J. Bowman,* and *N. O. Griswold,* for relator.

*Frank A. Miller* and *George E. Nichols,* for respondent.

BLAIR, J.   This is a proceeding by writ of certiorari to review the proceedings of the board of supervisors of the county of Montcalm with reference to the reconstruction of the court-house, containing the jail and sheriff's office and other county offices, which was destroyed by fire on the 16th day of February, 1905.   On the 27th day of February, 1905, the board met in special session, upon the call

of the county clerk, upon petition of more than one-third of the members of the board, at Corey's Hall, in the city of Stanton. The board comprised 26 members, all of whom were present. At the afternoon session of the board, " Supervisor Bailey moved that there be submitted to the qualified electors of the county the proposition to bond the county for $40,000, to be used to rebuild the court-house," which motion prevailed by 14 yeas to 12 nays. On the following day, February 28, 1905, Supervisor Holland presented the following resolution:

" *Whereas*, the Montcalm county court-house, which included the county offices, the county jail, and sheriff's residence, was destroyed by fire on the 16th day of February, A. D. 1905, and for this reason it is a public necessity that a new county court-house, for the county offices and other county purposes, and a county jail and sheriff's residence, be erected upon the present site, the court-house square, in the city of Stanton, Montcalm county, Michigan; therefore, be it

" *Resolved*, by the board of supervisors of the county of Montcalm, that the erection of a court-house for county offices and other county purposes, and also a county jail and sheriff's residence, is a public necessity; and be it further

" *Resolved*, that it is necessary for the county to borrow forty thousand dollars for the purpose of erecting said court-house, county jail, and sheriff's residence; and be it further

" *Resolved*, that there be submitted to the qualified electors of said county at the annual spring election, to be held on the first Monday of April, A. D. 1905, the proposition to borrow on the faith and credit of said county, and to issue its bonds therefor, the sum of forty thousand dollars, the proceeds to be used for the purpose of erecting a suitable court-house, and also a county jail and sheriff's residence—said money so borrowed to be paid in eight equal installments of five thousand dollars each," etc.

This resolution prevailed by 15 yeas to 10 nays. On the same day Supervisor Jenson presented the following resolution:

" *Resolved*, by the board of supervisors, that Corey's

Hall, situated in the Corey Block, the north side of Main street, in the city of Stanton, be, and the same is hereby, designated as the place of holding the sessions of the circuit court of the county of Montcalm, from this 28th day of February, A. D. 1905, to and until the 1st day of December, A. D. 1905, and that the sessions of this board shall also be held at the same place.

"The motion prevailed, a majority of the members voting therefor by yeas and nays, as follows:

"Yeas—Messrs. Bailey, Bannen, Bower, Boyer, Church, Dales, Freeman, Helmick, Holcomb, J. S., Holcomb, M. H., Holland, Lucas, Lute, Jenson, Kirker, Montgomery, Newton, Nichols, Porter, Rinker, Sharp, Stearns, Train, Westcott (24).

"Nays—None."

At the afternoon session Supervisor Holland offered the following resolution:

"*Resolved,* by the board of supervisors of the county of Montcalm, that the chairman of this board be, and he is hereby, requested to appoint a special building committee of said board, consisting of three members, and said committee be, and hereby is, instructed, empowered, and authorized to employ competent architects and adopt plans and specifications for the building of the new court-house, the county jail, and sheriff's residence, subject to the approval of this board, and said committee is also hereby further instructed, empowered, and authorized to superintend the arrangement for the temporary offices, and also for the temporary jail, and said committee is given full power and authority to do whatever in its judgment it may be deemed expedient and necessary for the purposes herein specified.

"Mr Bailey moved that the resolution be laid on the table.

"Mr. Bailey's motion did not prevail, the yea and nay vote resulting as follows:

"Yeas—Messrs. Bailey, Bannen, Bower, Church, Holcomb, M. H., Newton, Sharp, Sprague (9).

"Nays—Messrs. Boyer, Dales, Freeman, Helmick, Holcomb, J. S., Holland, Lucas, Lute, Jenson, Kirker, Porter, Rinker, Stearns, Train, Westcott (15).

"The resolution was adopted by the following yea and nay vote:

"Yeas—Messrs. Bailey, Bannen, Bower, Boyer, Church,

Dales, Freeman, Helmick, Holcomb, J. S., Holcomb, M. H., Holland, Lucas, Lute, Jenson, Kirker, Newton, Nichols, Porter, Rinker, Sharp, Sprague, Stearns, Train, Westcott (24).

"Nays—None.

"The chairman appointed as such committee Messrs. Holland, Jenson, and Porter.

"The minutes were read by the clerk, and approved as read.

"Mr. Jenson moved that the board adjourn sine die.

"The motion prevailed.

"The chairman declared the board adjourned."

The proposition to bond the county for $40,000 was submitted to the electors of the county, as provided in the resolution of February 28th, and was lost by a majority of 577. After the board of supervisors, at its session of April 11th, had canvassed the vote and arrived at this result, the committee on court-house and grounds presented the following report, which was adopted:

"To the honorable board of supervisors of Montcalm county:

"Your committee on court-house and grounds and insurance beg leave to submit the following report: After the burning of the court-house on the 16th of February, 1905, we furnished the adjusters for the insurance companies an estimated cost of the property destroyed by fire, which estimate showed a loss far greater than the amount of insurance. The adjuster recommended the payment in full of the claim of loss on building and contents, and the insurance companies allowed the same in full, and the same has been paid to the county treasurer of said county, the total amount of such insurance being $20,000, and since which time we have had the records, furniture, and supplies of the several offices insured as follows· The county clerk, judge of probate and commissioner of schools, now located in the Cahalan Building, insured for $5,000. The register of deed's records and office fixtures have not been insured, for the reason that we found it would cost us 6 per cent. to insure the records in the building where they were confined at the time we were authorized to insure them; and deeming this too high, we made arrangements with the city council to have his office removed into a safer place, and they secured room in the

store building of Charles Holland, where the register of deeds has now moved. But no insurance has been taken out upon that office, but will be attended to at once, if this meets with the approval of your honorable body, and which we do recommend. We have no instructions for taking any insurance upon the records, furniture, and supplies of the county treasurer, but would recommend that this office be insured."

At the afternoon session the building committee, by Supervisor Holland, reported as follows:

"Your committee has considered the matter of repairing the court-house at Stanton, and have secured plans from a competent architect, and we are informed'that it is practical to repair said court-house, and that the expense of repairing the same, carefully figured and estimated, amounts to $18,071. Therefore we have prepared a resolution which we will present at this time for the consideration of the board:

"*Whereas*, the Montcalm county court-house was injured and damaged by fire on the 16th day of February, A. D. 1905, and for this reason it is a public necessity that said court-house be repaired and rebuilt; and,

"*Whereas*, the cost of repairing and rebuilding said court-house will not exceed the sum of $20,000, and,

"*Whereas*, the said court-house at the time of the damage and injury by fire was insured in the sum of $20,000, which said money is now, or will be by the time the same is required for the purpose of such repairing and rebuilding, in the county treasury, to be used in the repairing and rebuilding of such court-house; therefore,

"*Resolved*, by the board of supervisors of the county of Montcalm, that the repairing and rebuilding of said court-house is a public necessity, and be it further

"*Resolved*, that the building committee heretofore appointed by said board of supervisors be, and is hereby, authorized and empowered to proceed to repair and rebuild said court-house, the cost of said repairing and rebuilding not to exceed the said sum of $20,000 now on hand to be used for that purpose.

"Mr. Holland moved the adoption of the report and resolution.

"The motion prevailed, a majority of the members voting therefor by yeas and nays, as follows:

"Yeas—Boyer, Dales, Fournie, Freeman, Holcomb,

J. S., Holland, Kirker, Lucas, Lute, Montgomery, Porter, Stearns, Westcott, Wood (14).

"Nays—Bailey, Bannen, Bower, Church, Dickerson, Holcomb, M. H., Jenson, Miller, Rarden, Sharp, Sprague, Van Wormer (12).

"A majority of the members having voted in favor of the adoption of the resolution, the chairman declared the same duly adopted."

On motion of Supervisor Dales, the accepting of plans for the repairing and building of the court-house was left in the hands of the building committee. This motion prevailed by 14 yeas and 12 nays.

The foregoing comprises substantially the entire record with reference to the rebuilding or repairing of the court-house building. The issues raised by the allegations of error relate to the power of the board of supervisors in the premises. The petitioner claims that the proceedings of the board upon the 11th day of April were null and void, for the reasons:

*First.* That the proposed work was the erection of a new building and not the repairing of the old building, and required a two-thirds vote of all the members of the board elected.

*Second.* Because the board could not expend to exceed $500 in repairing and rebuilding without submitting the question to a vote of the people.

*Third.* Because, even if the contemplated building constituted repairs, and not the erection of a new building, still the board could not use the fund provided from the collection of the insurance money without a two-thirds vote of all the members elect.

*Fourth.* Because of a delegation of powers resting solely in the board of supervisors to the building committee.

The primary question in this case is whether the proposed construction of the court-house, under the action of the board of supervisors of April 11, 1905, provides for the repair of the existing court-house, as it purports to, or whether, under the guise of repairing, it in reality provides for the erection of a new court-house. It is conceded

that, if the action of the board had the effect of providing for the erection of a new court-house, such action was void, since it was not supported by the necessary two-thirds vote of all of the supervisors elected. *Board of Sup'rs of Wayne County* v. *Wayne Circuit Judge*, 111 Mich. 33.

The dividing line between repairs and new construction is difficult of determination, and there is considerable conflict and uncertainty in the decisions of the courts upon this question. We think, however, that under statutes making a distinction between the erection of new structures and the repairing of existing structures, the repairing of a structure presupposes the retention of the substantial identity of the structure. As said by the court in *Wattles* v. *Coal Co.*, 50 Neb. 251 (36 L. R. A. 424):

"These words 'repair' and 'keep in repair' are not technical words, nor should they be given a technical or strained interpretation. They should receive their ordinary interpretation. 'To repair,' as it is ordinarily used, means to amend, not to make a new thing, but to refit, to make good, or restore an existing thing. See *Todd* v. *Inhabitants of Rowley*, 8 Allen (Mass.), 51; *Stephens' Ex'rs* v. *Milnor*, 24 N. J. Eq. 358. When we speak of repairing a thing, the very expression presupposes something in existence to be repaired."

In *Ardesco Oil Co.* v. *Richardson*, 63 Pa. 162, it is said:

"Repair means to restore to its former condition, not to change either the form or the material."

In *State* v. *White*, 16 R. I. 591, the court say:

"To repair means, according to Webster:

" 'To restore to a sound or good state after decay, injury, dilapidation, or partial destruction; as, to repair a house, a wall or a ship.'

"To amend, according to the same author, means:

" 'To change in any way for the better; as (*a*) by simply removing what is erroneous, corrupt, superfluous, faulty, and the like;

(b) by supplying deficiencies; (c) by substituting something else in the place of what is removed.'

"We think that the building of a new bridge in a highway is something more than merely repairing the highway, within the meaning of said section 1. Indeed, the statute seems to view it in this light; for by Pub. Stat. R. I. chap. 34, § 5, it is provided that towns may appropriate money 'for the building, repairing, and amending of bridges.' To build is to construct and raise anew, and not simply to amend or repair something previously constructed.

"Says Rogers, J., in *Cornell* v. *Vanartsdalen*, 4 Pa. 364, 370, referring to the term 'repairs:'

"'It is not a technical expression, and must be taken as used in its ordinary sense, and does not extend to improvements of the soil. * * * Repairs do not include new buildings, but they are a restoration to a sound state of what had gone into partial decay or dilapidation, or bettering of what had been destroyed in part. * * * The word "repairs" is plain, unambiguous, and must be considered as used in the sense in which it is ordinarily understood. To repair is to restore to a sound state, to mend or refit.'"

In *Board of Com'rs of White County* v. *Gwin*, 136 Ind. 562 (22 L. R. A. 402), the circuit court under its power to order necessary repairs, after having condemned the court-room as unsafe, approved and adopted certain plans and specifications, and ordered "that said court-room be repaired in accordance therewith." The court say : `

" We have already seen that, when the plans and specifications made a part of the order are carried out, there will be left standing only a very small part of the old building, a small portion of the old walls. Everything else will be new, and there will be additions and extensions, all of which will be entirely new. It is manifest from the face of the record of the order that the intent was to come as near building a new court-house as possible, and yet retain any semblance of repairs.

" It is quite manifest from the order that the only reason that any portion of the old, dilapidated wall was retained was to furnish a nucleus around which repairs could be made with some plausibility, and so that the court might be able to say the work ordered was repairs.

"The work contemplated and described in the plans and specifications cannot be denominated 'repairs' with any regard to accuracy of expression, as we shall hereinafter see."

And again:

"A case much more in point, and nearly parallel—indeed, exactly parallel—with the case at bar as to the extent of the power conferred where a duty to repair is imposed by law, was decided by this court, and a conclusion was therein reached contrary to that reached in the cases above referred to. It was said by Elliott, J., speaking for the whole court in that case, that:

"'We are unable to resist the conclusion that the trustee, under color of making repairs and removing obstructions, has changed and improved the ditch in several essential particulars. The ditch had been greatly widened and deepened, and, doubtless, much improved, since the amount expended is almost twice the cost of the original ditch. The inference from the facts stated is that the trustee has improved the ditch instead of repairing it.

"'Under authority to repair, there can be no enlargement and improvement, except in so far as the work of repairing necessarily enlarges and improves. "Repair," says the supreme court of Pennsylvania, "means to restore to sound or good condition, after injury, or partial destruction." *Pittsburg, etc., R. Co.* v. *City of Pittsburg*, 80 Pa. 72.

"'The authority of the township trustee was to restore the ditch as nearly as practicable to its original condition, not to enlarge or improve, no matter how much the improvement may have been needed, nor how much property owners may have been benefited.' *Weaver* v. *Templin*, 113 Ind. 303.

"The same principle was asserted by this court in *Western Paving & Supply Co.* v. *Railroad Co.*, 128 Ind. 534 (10 L. R. A. 770), where it was said:

"'The obligation to repair a street is one thing, and the obligation to construct a street is another and different thing. To repair a thing is to restore it to a sound state after decay, injury, dilapidation, or partial destruction. To reconstruct is to construct or build again. One who only assumes an obligation to repair a house could not be required to tear it down and rebuild it.'

"So the weight of authority seems to be that the power to repair does not carry with it or imply the power to rebuild or reconstruct."

See, also, *Fort Wayne, etc., R. Co.* v. *City of Detroit,*
34 Mich. 78; *Goodyear Shoe Machinery Co.* v. *Jackson,*
112 Fed. 146 (55 L. R. A. 692); *Gavan* v. *Norcross,*
117 Ga. 356; *Carlton* v. *Newman,* 77 Me. 408.

The specifications for repairing the court-house provide,
among other things, that:

"The outside walls of the building are not to be altered
or changed in any way; it being the intention and pur-
pose, under the plans as prepared and these specifications,
to restore and refit said building for a court-house and
county building within the present outside walls, and
place the same in a good, safe, and sound condition, with
fireproof offices, and in so doing to use and utilize the out-
side walls and as much of the inside walls as may be, in
view of the changes and alterations to be made in the size,
conditions, and location of the court-room and other rooms,
offices, and vaults as shown by said plans and these speci-
fications, and only so much of the outside and inside walls
are to be altered, changed, or added to as may be neces-
sary to carry out the general intention and purpose of re-
pairing said building, and refitting and restoring the same
for use as a court-house and county building, remodeled and
repaired so as to be more convenient and practicable for
public use and better in general appearance than hereto-
fore.

"Such repairs, changes, and alterations are expressly
limited to such alterations and changes as may be nec-
essary to carry out the general intention of repairs upon
and within said building as shown by the drawings, plans,
and these specifications, that is to say: The outside brick
walls to be taken down to remove the present brick cor-
nice, and to such level as shown on elevation; also the
entire wall of the front of the building at portico, all open-
ings in walls for frames, etc., to be lowered, raised, or
cut in new and built as shown on elevations and plans
(see brick work), and the inside brick walls and founda-
tions to be retained without change when the same can
be used or utilized by repairing where needed, and when
such walls and foundations shall conform to said plans
and elevations.

"*Common Brick Work.*—Take down all inside brick
walls, chimneys, vaults, and all other inside brick work
required to carry out the work according to the plans and
specifications.

" Build all brick walls above concrete walls, such as interior walls, backing for exterior walls, flues, patching, and all other brick work except face brick work (see face brick), with good, hard, common, merchantable brick, to be free from lime. * * *

"Build 4-inch brick wall inside around the entire outside walls in subbasement to receive ground floor joists, these bricks to be laid in cement mortar.

" Also carry up brick wall in cement mortar on the inside of outside walls to receive first-story floor joists. * * *

" The outside walls of the building that are solid, safe, and not damaged, and stand erect, below the height of the walls as shown on the drawings, are not to be taken down, except where necessary to carry out the general intentions of the plans and these specifications according to the provisions and details as hereinbefore set forth under paragraph headed ' General Conditions.' * * *

" The foundation footings for all new exterior and interior walls, together with piers, chimneys, flues, etc., to be of the several widths and thicknesses as shown on plans. * * *

" The new concrete foundation walls to be carried up to the several heights as shown on sectional drawings. * * *

" The entire outside foundation walls that remain standing to be flushed up on the inside with 1 to 2 Portland cement to a full and even surface satisfactory to architect, and all wooden charred timbers to be removed. * * *

"What Building Committee Will Furnish.—Will furnish and lay sidewalks. Will furnish and put in electric wiring. Will furnish and put in call bells. Will furnish and put in all electric-light fixtures. Will furnish and put in all plumbing. Will furnish and put in the entire heating plant, including the setting of boilers, etc. Will furnish vault doors, contractor to set. Will furnish all vault fixtures and steel shutters for windows. Will furnish all desks and cabinet fixtures for offices."

As appears by the plans and specifications, substantially all that was to be retained of the old building was the outside containing walls, which were to be reduced in height some 10 feet, entirely removed at front of building at portico, and strengthened at the bottom on the inside up to the first-story joists by a new 4-inch brick wall and flushed

with cement.  Only such portions of the outside walls are to be retained as "are solid, safe, and not damaged and stand erect."  All else was new.  The jail and sheriff's office contained in the old building were entirely omitted from the new, and no provision was made for them elsewhere.  The portico was entirely new.  The entrance to the building, the hallways, the windows, and doors, the arrangement of the rooms, were all changed, and neither in the exterior nor the interior appearance of the proposed building, with its new portico, was there anything to remind any familiar observer of the old court-house.  The old building was determined by the board of supervisors to have been "destroyed by fire," and a new building required to take its place, to cost $40,000, as shown by their resolutions of February 27th and 28th, and the report of the committee in April shows that the actual loss was " far greater than the amount of insurance," which the insurance companies paid in full.  We think it must be said, as remarked by the supreme court of Indiana in *Board of Com'rs of White County* v. *Gwin*, supra:

" It is manifest from the face of the record that the intent was to come as near building a new court-house as possible and yet retain any semblance of repairs."

We think, however, that if the contemplated improvements are properly designated as repairs, a two-thirds vote would still be required to render the action lawful. The contemplated repairs were to be paid for out of the insurance money collected by the county treasurer.  Sections 2543 and 2544 of the Compiled Laws of 1897 provide as follows:

" (2543) SEC. 44.  When directed by the board of supervisors, the county treasurer shall cause to be insured any or all the public buildings belonging to the county, as said board shall direct, and the insurance thereon shall be taken in the name of the treasurer, and his successors in office.

" (2544) SEC. 45.  In case of the destruction of, or damage done to the buildings so insured, the treasurer shall have authority, and it shall be his duty, to demand

and receive the moneys which shall be due on account of such insurance, and in case of neglect or refusal to pay the same, he shall sue for and collect such moneys in his name of office whenever directed by the board of supervisors, and pay the same into the county treasury, to be used in repairing or rebuilding such public buildings."

It will be observed that there is no express provision in these sections authorizing the board of supervisors to use the money when collected by the treasurer, and unless authority to use such funds is granted by some other section it would be derived from subdivision 16 of section 2484, which reads as follows:

"*Sixteenth.* To represent their respective counties, and to have the care and management of the property and business of the county in all cases where no other provision shall be made."

Express authority is granted by section 2480 to repair public buildings, as follows:

"(2480) SEC. 7. It shall be the duty of such board, as often as shall be necessary, to cause the court-house, jail, and public offices of their county to be duly repaired at the expense of such county; but the sums expended in such repairs shall not exceed five hundred dollars in any one year, unless authorized by a vote of the electors of such county, as hereinafter provided."

This section limits the amount to be expended in any year to $500, unless authority to expend more is granted by the electors of the county. This section clearly does not apply to the insurance fund, since the vote is only to be taken when the money is to be raised by tax or loan. We think, therefore, that subdivision 16, supra, governs, and, as any action under that subdivision requires for its validity a two-thirds vote, the action of the board was invalid. See section 2485, 1 Comp. Laws.

We think the board of supervisors has a right to use the insurance moneys collected, upon the injury or destruction of a public building, either to repair or rebuild the structure, without submitting the question to the electors; but

such action must be sanctioned by the votes of two-thirds of all of the members elected.

We think that the circuit court commissioner had authority to allow the writ and that it was not improvidently allowed. 3 Comp. Laws, § 10498; *Loder* v. *Littlefield*, 39 Mich. 374; *Monroe* v. *Reynells*, 131 Mich. 259. The proceeding was properly instituted by the attorney general. *Attorney General* v. *City of Detroit*, 26 Mich. 263.

It results that the proceedings of the board must be quashed, with costs to relator.

McALVAY, GRANT, and HOOKER, JJ., concurred with BLAIR, J.

MONTGOMERY, J.  I concur on the last point.